**SHUB & JOHNS LLC**
Jonathan Shub (State Bar No. 237708)
jshub@shublawyers.com
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 477-8380

**WITTELS MCINTURFF PALIKOVIC**
Ethan D. Roman *
edr@wittelslaw.com
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (914) 775-8862

* *Motion for pro hac vice admission forthcoming*

[NAMES AND ADDRESSES OF ADDITIONAL
COUNSEL APPEAR ON SIGNATURE PAGE]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SEAN SMALL DE LA CRUZ,** on behalf of himself and all others similarly situated, | **No.  5:24-cv-1317** |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| **BETTERHELP, INC.,** | |
| **Defendant.** | |

Plaintiff Sean Small de la Cruz ("Plaintiff"), by his undersigned attorneys, Shub & Johns LLC and Wittels McInturff Palikovic, brings this consumer protection action in his individual capacity and on behalf of a class of consumers defined below against Defendant BetterHelp, Inc. (hereafter the "Company" or "Defendant" or "BetterHelp") and hereby alleges the following with knowledge as to his own acts and upon information and belief as to all other acts:

## INTRODUCTION

1.　　This is a proposed class action lawsuit against the telehealth company BetterHelp, Inc. for engaging in illegal and deceptive practices to trick consumers into enrolling in its pricey therapy services and using illegal "automatic renewal" practices in connection with its subscription plans.

2.　　To protect Californians from deceptive autorenewal practices, California enacted its Automatic Renewal Law, BUS. & PROF. CODE §§ 17600–06 (the "ARL").　The ARL requires companies employing automatic renewal payment mechanisms to provide "clear and conspicuous" disclosures about the autorenewal plan, obtain consumers' "affirmative consent" to autorenewal, and provide a "cost-effective, timely, and easy-to-use mechanism" for cancelling the subscription.

3.　　The "primary objective" of the EFTA "is the provision of individual consumer rights," which is accomplished through "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. §§ 1693(b).　The EFTA requires third-party payees like BetterHelp to obtain prior written consent before initiating recurring electronic fund transfers and to provide a copy of that authorization to consumers. *Id.* § 1693e(a).

4.　　BetterHelp is "the world's largest therapy platform" that advertises widely online and with dozens of podcasts claiming the Company makes "professional therapy accessible, affordable, and convenient."　BetterHelp offers virtual therapy sessions through the Internet or by phone with a variety of psychologists, therapists, social workers, and counselors.

5.　　Members of the public search online or are directed to BetterHelp's website through advertising to enroll for therapy sessions.　But while consumers are signing up for these services

---

**CLASS ACTION COMPLAINT** 2

crucial to their mental health and personal well-being, BetterHelp uses illegal and deceptive practices to enroll such consumers into automatically renewing subscriptions costing hundreds of dollars per month that consumers do not want and did not know they signed up for.

6.      BetterHelp's enrollment process is deceptive and violates the ARL because it fails to provide clear and conspicuous disclosures regarding BetterHelp's automatic renewal terms and does not obtain consumers' affirmative consent to automatic renewal.  The enrollment process also fails to obtain consumers' written authorization for electronic fund transfers, as required by the EFTA. Similarly, BetterHelp fails to send consumers copies of their written authorization for electronic fund transfers.

7.      BetterHelp's subscription has a "negative option" renewal policy, which means it automatically bills consumers each month unless they take affirmative steps to cancel.  BetterHelp's subscriptions cost a monthly fee of up to $80.  Due to BetterHelp's negative option renewal policy, many consumers who enroll in a BetterHelp membership ultimately end up paying fees for a BetterHelp subscription that they did not want.

8.      Once a consumer signs up for a BetterHelp subscription, the Company employs a number of strategies designed to ensure the consumer does not stop paying for its services.  These deceptive design practices aim to manipulate users into taking certain actions and exploit known frailties in human cognitive processing are known as "dark patterns."

9.      For example, canceling a BetterHelp subscription is made exceedingly difficult and requires a consumer to figure out—with no help from the Company—how to navigate BetterHelp's cancellation process consisting of multiple confusing steps, rounds of surveys, and a hidden cancellation button to bring their recurring payments to a halt.

10.     Only through a class action can consumers remedy BetterHelp's unlawful practices. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge BetterHelp's improper conduct, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Furthermore, many customers do not realize they are victims of BetterHelp's unlawful acts and continue to be charged

to this day.  With this class action, Plaintiff and the Class seek to level the playing field, enjoin BetterHelp's unfair business practices, and recover the charges BetterHelp has imposed on Plaintiff and the Class in violation of the law.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

12.    This Court may exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

13.    This Court has personal jurisdiction over Defendant BetterHelp, Inc. because it is headquartered in this District, conducts substantial business in this District, and has sufficient minimum contacts with this District.  Defendant BetterHelp, Inc. otherwise purposely avails itself of the privileges of conducting business in California by marketing and selling products and services in California, and the injuries to California consumers that Plaintiff seeks to prevent through public injunctive relief arise directly from Defendant's continuing conduct in California, including, but not limited to, directing its auto-enrollment and renewal practices at California consumers.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  Substantial acts in furtherance of the alleged improper conduct occurred within this District, as BetterHelp is headquartered in this District, does business in this District, and Plaintiff resides in this District.

## PARTIES

15.    Plaintiff Sean Small de la Cruz is a citizen of California and lives in Union City, California.  Unbeknownst to Plaintiff, after he enrolled in a BetterHelp subscription in June 2023, BetterHelp continued charging him for an automatically renewing monthly membership.

16.    Plaintiff is a consumer who was victimized by BetterHelp's unlawful auto-enrollment practices, suffered injury in fact and lost money because of BetterHelp's violations of California's

consumer protection statutes and the EFTA and thus has standing to pursue public injunctive and other relief to protect California consumers from BetterHelp's continuing violations.

17.     Defendant BetterHelp, Inc. is a telehealth company, incorporated in Delaware with headquarters located at 990 Villa Street, Mountain View, California 94041.

## FACTUAL ALLEGATIONS

### A.      Background on the Subscription e-Commerce Industry

18.     The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[1]  Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[2]  According to the Washington Post, analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[3]

19.     The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  "Over the past 11 years, subscription-based companies[] have grown 3.7x faster than the companies in the S&P 500."[4]

20.     The expansion of the subscription e-commerce market shows no signs of slowing.  According to The Washington Post, "[s]ubscriptions boomed during the coronavirus pandemic as

---

[1] *See* Sam Saltis, CORE DNA, How to Run an eCommerce Subscription Service: The Ultimate Guide, https://www.coredna.com/blogs/ecommerce-subscription-services.

[2] Mary Mesienzahl, BUSINESS INSIDER, Taco Bell's taco subscription is rolling out nationwide — here's how to get it, Jan. 6, 2022, https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[3] Heather Long and Andrew Van Dam, WASHINGTON POST, Everything's becoming a subscription, and the pandemic is partly to blame, June 1, 2021, https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/.

[4] The Subscription Economy Index, ZUORA, Mar. 2023, https://www.zuora.com/resources/subscription-economy-index/.

**CLASS ACTION COMPLAINT**                                                                                  5

Americans largely stuck in shutdown mode flocked to digital entertainment[.] . . . The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[5]

21.     However, there are downsides associated with the subscription-based business model. While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[6] In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[7] Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[8] As these companies have realized, "[t]he real money is in the inertia."[9] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[10] That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this

---

[5] Heather Long and Andrew Van Dam, WASHINGTON POST, Everything's becoming a subscription, and the pandemic is partly to blame, June 1, 2021, https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/.

[6] McKinsey & Company, Thinking inside the subscription box: New research on e-commerce consumers, February 2018, https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[7] Id.

[8] Amrita Jayakumar, WASHINGTON POST, Little-box retailing: Subscription services offer new possibilities to consumers, major outlets, Apr. 7, 2014, https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[9] Id.

[10] Zoe Schiffer, BUSINESS INSIDER, A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want, June 25, 2019, https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.

**CLASS ACTION COMPLAINT**                                                                 6

by intentionally confusing users with their app's design and flow, … and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[11]

22.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[12]  Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[13]  Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts [and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[14] widespread utilization of these misleading dark patterns and deliberate omissions persist.

23.     The term "dark patterns" in this Complaint is not a science fiction reference, but a term of art from the field of user experience ("UX").   The International Organization for Standardization (IOS) defines "user experience" as a "person's perceptions and responses that result from the use or anticipated use of a product, system or service."[15]  Dark patterns in UX are "carefully designed misleading interfaces by UX design experts that trick the users into choosing paths that

---

[11] Sarah Perez, TECHCRUNCH, Sneaky subscriptions are plaguing the App Store, Oct. 15, 2018, https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[12] Heather Long and Andrew Van Dam, WASHINGTON POST, Everything's becoming a subscription, and the pandemic is partly to blame, June 1, 2021, https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* NEW MEDIA AND MARKETING, The problem with subscription marketing, Mar. 17, 2019, https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[13] *Id.*

[14] *Id.*

[15] UIUX TREND, User Experience (UX): Process and Methodology, https://uiuxtrend.com/user-experience-uxprocess/.

**CLASS ACTION COMPLAINT**                                                                 7

they didn't probably want to take, thus fulfilling the business objectives, completely ignoring the requirements and ethics of users."[16]

24.     The term was first coined by cognitive scientist Harry Brignull, who borrowed from existing UX terminology.  In UX, designers refer to common, re-usable solutions to a problem as a "design pattern," and conversely to common mistakes to solutions as "anti-patterns."[17]  The term "dark patterns" was intended to "communicate the unscrupulous nature" of the design "and also the fact that it can be shadowy and hard to pin down."[18]  The image on the following page provides some examples of commonly employed dark patterns:[19]

---

[16] Joey Ricard, KLIZO SOLS. PVT. LTD., *UX Dark Patterns: The Dark Side Of The UX Design*, Nov. 9, 2020, https://klizos.com/ux-dark-patterns-the-dark-side-of-the-ux-design/.

[17] Harry Brignull, MEDIUM, *Bringing Dark Patterns to Light*, June 6, 2021, https://harrybr.medium.com/bringing-dark-patterns-to-light-d86f24224ebf.

[18] *Id.*

[19] Sarbashish Basu, H2S MEDIA, *What is a dark pattern?  How it benefits businesses- Some examples*, Dec. 19, 2019, https://www.how2shout.com/technology/what-is-a-dark-pattern-how-it-benefit-businesses-with-some-examples.html.

**CLASS ACTION COMPLAINT**                                                                            8








# DARK PATTERNS

UX Knowledge Base Sketch #29

DARK PATTERNS ARE TRICKS [FINE LINE BETWEEN INFLUENCING USERS' BEHAVIOR AND TRICKING THEM!] THAT MAKE THE USERS DO THINGS THEY DID NOT MEAN TO.

DARK PATTERNS CAN WORK IF SOMEONE IS LOOKING FOR SHORT-TERM RESULTS. ONLY INITIAL SUCCESS, NOT SUSTAINABLE

vs.

USING DARK PATTERNS HAS A NEGATIVE IMPACT IN THE LONG-TERM. USERS WILL SWITCH TO MORE ETHICAL PRODUCTS/SERVICES

— THE MOST COMMON TYPES —

   

FORCED CONTINUITY
FREE TRIAL → CHANGES TO A PAYING SCHEME WITHOUT WARNING

ROACH MOTEL
THE START IS EASY (SIGN UP/SUBSCRIPTION), QUITTING IS HARD

GROWTH HACKING THROUGH SPAMMING
YOU BECOME THE SPAMMER WITHOUT KNOWING IT

   

DELIBERATE MISDIRECTION
FOCUSING THE USERS' ATTENTION ON THE MORE EXPENSIVE OPTION, HIDING THE CHEAPER WAY

OBSCURED PRICING
MAKING IT HARD TO COMPARE THE PRICES

SNEAK INTO BASKET
A RANDOM ADDITIONAL ITEM APPEARS IN YOUR BASKET (WITHOUT YOUR CONSENT)

  

BAIT & SWITCH
USE A CONVENTION, PATTERN IN A WAY TO MAKE THE USER FALSELY ASSUME SOMETHING

DISGUISED ADS
AN AD LOOKING LIKE ANOTHER TYPE OF CONTENT/NAVIGATION

ROADBLOCK
A POP-UP INTERRUPTS YOUR INTENDED ACTION

   

HIDDEN COSTS
AT THE CHECKOUT, A NEW, UNEXPECTED COST APPEARS

PRIVACY ZUCKERING
SHARING MORE PRIVATE INFO THAN YOU WANT

MISINFORMATION
E.G. CONFUSING
└ COLOR, CONTRAST
└ LANGUAGE

TRICK QUESTIONS
CHECK BOX TREACHERY

25.     The origin of dark patterns can be traced to the use of applied psychology and A/B testing in UX.[20]   In the 1970s, behavioral science sought to understand irrational decisions and behaviors and discovered that cognitive biases guide all our thinking.   The image on the following page provides examples of cognitive biases, including some that BetterHelp employs in its cancellation process[21]:

---

[20] *Id.*

[21] Krisztina Szerovay, UX KNOWLEDGE BASE, *Cognitive Bias — Part 2*, Dec. 19, 2017, https://uxknowledgebase.com/cognitive-bias-part-2-fab5b7717179.

**CLASS ACTION COMPLAINT**                                                                               9

26.     Whereas the early behavioral research focused on understanding rather than intervention, later researchers, like Cass Sunstein and Richard Thaler, authors of the book *Nudge* made a policy argument that institutions should engineer "choice architectures" in a way that uses behavioral science for the benefit of those whom they serve.[22]

27.     Another step in the development is the use of A/B testing in UX.  A/B testing is a quantitative research method that presents an audience with two variations of a design and then measures which actions they take (or do not take) in response to each variant.[23]  UX designers use this method to determine which design or content performs best with the intended user base.[24]  For

---

[22] Arvind Narayanan *et al.*, *Dark Patterns: Past, Present, and Future.  The evolution of tricky user interfaces*, 18 ACM QUEUE 67-91, 2002, https://queue.acm.org/detail.cfm?id=3400901.

[23] UXPin, *A/B Testing in UX Design: When and Why It's Worth It*, https://www.uxpin.com/studio/blog/abtesting-in-ux-design-when-and-why/.

[24] *Id.*

**CLASS ACTION COMPLAINT**                                                                                  10

example, a large health care provider might A/B test whether a website visitor is more or less likely to conduct a search of its doctors if the website's search function is labelled "SEARCH" versus simply identified by a magnifying glass icon.

28.     Unscrupulous UX designers subverted the intent of the researchers who discovered cognitive biases by using these principles in ways that undermined consumers' autonomy and informed choice, and they used A/B testing to turn behavioral insights into strikingly effective user interfaces that deceived consumers in ways that were more profitable to the company applying them.[25]  Dark patterns increase a company's ability to extract revenue from its users by nudging or tricking consumers to spend more money than they otherwise would, yield more personal information, or see more ads.[26]

29.     A combination of dark patterns has a compounding effect, which will increase the impact of each dark pattern and exacerbate the harm they present to the consumer.[27]  BetterHelp uses a combination of dark patterns to decrease the likelihood that its subscribers will make it all the way to the final confirmation of cancellation.  For example, BetterHelp employs misdirection, which is when "the design purposefully focuses your attention on one thing in order to distract your attention from another."[28]  Brightly colored text offering alternatives to canceling are not intended to streamline the process of cancellation, but to confuse and distract the BetterHelp subscriber and keep them from canceling their subscription.

30.     BetterHelp also uses confirm-shaming, where the "option to decline is worded in such a way as to shame the user into compliance."[29]

---

[25] Narayanan *et al*., *supra* note 22.

[26] *Id.*

[27] FTC, Staff Report, *Bringing Dark Patterns to Light* at 2, Sept. 2022, https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

[28] *Types of deceptive design*, https://www.deceptive.design/types.

[29] *Id.*

**CLASS ACTION COMPLAINT**                                                                                     11

31.     More generally, BetterHelp membership fits the roach motel dark pattern, where "you get into a situation very easily, but then you find it is hard to get out of it (*e.g.*, a premium subscription)."[30]  Signing up for BetterHelp is very easy, whereas cancellation is burdensome.

32.     Defendant has successfully engaged in these unlawful subscription practices.  In 2022, BetterHelp brought in over $1 billion in revenue.[31]  The Company currently has more than 2.5 million paying subscribers,[32] but only a fraction (approximately 300,000) of those users are "active."[33]

**B.     BetterHelp's Enrollment Process Violates the ARL**

33.     On or around June 25, 2023, Plaintiff visited BetterHelp's website to view its offerings.

34.     Plaintiff completed the BetterHelp enrollment process and chose to enroll in a month-long BetterHelp subscription, costing $320, discounted to $288.

35.     Upon information and belief, the payment screen for the enrollment process that Plaintiff used in June 2023 was materially similar to BetterHelp's current payment page, as reproduced on the following pages:

---

[30] *Id.*

[31] Laura Lovett, BEHAVIORAL HEALTH BUSINESS, BetterHelp Rakes in $1B in 2022, as Teledoc Plans to Integrate Behavioral Health into Its Chronic Care Strategy, Jan. 9, 2023, https://bhbusiness.com/2023/01/09/betterhelp-rakes-in-1b-in-2022-as-teladoc-plans-to-integrate-behavioral-health-into-its-chronic-care-strategy/.

[32] MEDICALNEWSTODAY, Our BetterHelp Review (2023)

[33] Laura Lovett, BEHAVIORAL HEALTH BUSINESS, Teladoc's BetterHelp Sees Active User Rate, App Downloads Skyrocket, Aug. 23, 2022, https://bhbusiness.com/2022/08/23/despite-teladocs-nyse-tdoc-rocky-earnings-reports-its-mental-health-subsidiary-betterhelp-has-seen-its-number-of-active-users-skyrocket-this-year/.

# Babs, welcome to BetterHelp!

(i) Thanks for telling us your preferences! As we search for your therapist, please read the following guide and begin your membership.

### What is the therapy process?

You indicated that you have never had therapy before, here is some information that might be helpful as you get ready to begin.

### What happens next?

- You will receive a personalized match to a qualified and licensed therapist.
- Your therapist will thoughtfully review what you've shared and reach out to you.
- You can begin communicating with your therapist online, and your therapy process begins.

### Who will be my therapist?

We'll look for a personalized therapist match based on your preferences of:

- Older therapist (45+)
- A therapist who has experience treating: Family conflicts, Guilt and Shame

### How do I talk to my therapist?

You have many options for how you choose to communicate with your therapist. You can send audio, video, or text messages to your therapist at any time in the messaging room. You can also schedule weekly live sessions (30 to 45 min) with your therapist to communicate via phone, video, or live chat.

### What if I don't like the therapist that was matched to me?

You can ask to be matched to a different therapist. BetterHelp has over 33,000 therapists with different qualifications and areas of expertise that are available based upon your location, preferences, and therapist availability.

### How much will it cost?

With BetterHelp you can have professional therapy for only **$90 per week, charged every 4 weeks.** Unlike traditional in-office therapy, which can cost $150-$180 per session, your BetterHelp membership includes a weekly live session (video, phone, or chat), and the ability to message your therapist anytime, from anywhere. The subscription is billed and renewed every 4 weeks unless it is cancelled. It includes both the use of the secured site and the therapy service itself.
If you can't afford therapy, you may be eligible to receive financial aid – click here to apply.

### How long will I use the service?

As long as you need. You can manage your membership or cancel anytime from your Account Settings.

### Can I use my HSA/FSA card?

Yes. BetterHelp accepts HSA/FSA cards and is an eligible expense under most HSA/FSA providers.

**Can I use my HSA/FSA card?**

Yes. BetterHelp accepts HSA/FSA cards and is an eligible expense under most HSA/FSA providers.

## BetterHelp vs. traditional in-office therapy

| | betterhelp | In-office |
|---|:---:|:---:|
| Provided by a licensed therapist ⓘ | ✓ | ✓ |
| In-office visits ⓘ | ✕ | ✓ |
| Messaging any time ⓘ | ✓ | ✕ |
| Chat sessions ⓘ | ✓ | ✕ |
| Phone sessions ⓘ | ✓ | ✕ |
| Video sessions ⓘ | ✓ | ✕ |
| Easy scheduling ⓘ | ✓ | ✕ |
| Digital worksheets ⓘ | ✓ | ✕ |
| Group sessions ⓘ | ✓ | ? |
| Smart provider matching ⓘ | ✓ | ✕ |
| Easy to switch providers ⓘ | ✓ | ✕ |
| Access therapy from anywhere ⓘ | ✓ | ✕ |
| Cost ⓘ | $90 per week* | Avg. $150 per session** |

\* BetterHelp subscriptions are charged every 4 weeks.
\*\* Cost refers to private practice fees when not reimbursed by a third party.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

\* BetterHelp subscriptions are charged every 4 weeks.
\*\* Cost refers to private practice fees when not reimbursed by a third party.

**Apply for financial aid**

**Cost: $90 per week (charged every 4 weeks) - includes a weekly live session and text, audio and video messaging anytime.** ⓘ

✓ Benefit code   psa   applied!

Your cost : ~~$90 per week~~ $81 per week (charged every 4 weeks).

Your card will be charged ~~$360~~ $324 (you save $36).

Your promotional discount applies to all payments through October 12, 2023.

Enter payment information to start:

| Credit Card | G Pay Google Pay |
|---|---|
| ✓ Credit Card | Google Pay |

| Card number | MM / YY   CVC   🔒 |

VISA  Mastercard  Discover  American   (FSA/HSA cards accepted)

**Start Therapy**     I can't afford therapy

If you are in a crisis or any other person may be in danger - don't use this site.
These resources can provide you with immediate help.


256-bit SSL
SECURE

---

**CLASS ACTION COMPLAINT**                                                    15

36.     BetterHelp's payment page violates the ARL in several respects.

37.     First, BetterHelp's automatic renewal offer on its payment page is not presented to consumers in a "clear and conspicuous" manner, as defined in the ARL.  The only language that discloses that the subscription or purchasing agreement will continue, pursuant to section 17601(b)(1), is under the heading "How much will it cost?" and states "[t]he subscription is billed and renewed every 4 weeks unless it is cancelled."  This language is not in larger type than the surrounding font, is colored gray rather than a more conspicuous color, and is buried in the middle of the paragraph regarding pricing.  The combination of the font size and color, as well as BetterHelp's failure to set off this language from the surrounding text, do not clearly call attention to the automatic renewal offer.  *See* BUS. & PROF. CODE § 17601(c).  Nor is the automatic renewal language set off by symbols or other marks.  *Id.*

38.     Instead, the overall design of the page, including the notice placement, font size, and color ***deemphasize*** the notice text rather than render it conspicuous.  BetterHelp's payment page includes at least three computer screens of text, with the automatic renewal language hidden in between other information regarding BetterHelp's services.  This makes it unlikely consumers will even see these inadequate disclosures.  The payment page then contains a long list of features contrasting BetterHelp with "traditional in-office therapy," with colorful symbols prominently displayed in green and red.  BetterHelp's cost is displayed in bold but only so as to favorably compare it to the cost of "traditional in-office therapy."

39.     BetterHelp's payment box likewise does not sufficiently present BetterHelp's automatic renewal offer to consumers.  Again, the automatic renewal language is not in larger type than the surrounding font, is colored black rather than a more conspicuous color, and although a portion of the language is somewhat bolded, the combination of the font size and color do not clearly call attention to even this bolded snippet.  *See* BUS. & PROF. CODE § 17601(c).  Nor is the automatic renewal language set off by symbols or other marks.  *Id.*

40.     Moreover, any supposed "disclosures" on the BetterHelp payment page are far overshadowed by the page's other components in a clear demonstration of the "Misinformation"

dark pattern.  The payment page uses at least 12 different colors, presents information in differently sized fonts and in various boxes, and includes hyperlinks and a half dozen different logos.   In contrast, the automatic renewal terms are hidden in the middle of the page, difficult to discern and easy to miss.

41.     Second, the BetterHelp payment screen fails to include a clear and conspicuous disclosure of the cancellation policy that applies to the offer.  The statement that the subscription "is billed and renewed every 4 weeks unless it is cancelled" is not a description of the cancellation policy that applies to the offer.  *See* BUS. & PROF. CODE § 17601(b)(2).  Moreover, even if it were a description of the cancellation policy, it is an insufficient and unlawful disclosure because it is hidden in a wall of text on BetterHelp's payment page and it does not contain any disclosure regarding cancellation in visual proximity to the automatic renewal offer.

42.     Third, the BetterHelp acceptance page fails to obtain consumers' affirmative consent to the Company's automatic renewal offer.  BUS. & PROF. CODE § 17602(a)(2).  The BetterHelp page contains no mechanism for affirmatively consenting to the automatic renewal offer.  For example, there is no checkbox that consumers must click to indicate that they accept the offer.

43.     After Plaintiff enrolled in BetterHelp, BetterHelp sent Plaintiff an email on June 25, 2023 with the subject line "Your BetterHelp membership."  This email does not meet the requirements the ARL imposes after purchase of an automatically renewing product or service.  BUS. & PROF. CODE § 17602(a)(3).

44.     The acknowledgement email sent to Plaintiff is reproduced on the following page:

Hi Sean,

Thank you for being a member of BetterHelp. We hope you find therapy he=pful!

We wanted to let you know that your card ending in 6041 was charged.

Your selected plan: $80/week billed and renewed every 4 weeks. You are receiving a special discount of 10% until Jul 26, 2023.=br />
The current charge of $288.00 cove's your subscription for four weeks =fter you are matched with a therapist. This process can take 24 to 48 hour= but in most cases is faster.

Please remember that you can review, change or cancel your subscription=at any time by logging into =our account and clicking "Payment Settings".

Please let us know if you have any questions or you need assistance by =imply replying to this email.

Thanks,
BetterHelp Team

45.     The acknowledgement email violates the ARL because it does not include "information regarding how to cancel in a manner that is capable of being retained by the consumer." BUS. & PROF. CODE § 17602(a)(3).   Instead, it merely states that Plaintiff could "cancel [his] subscription at any time" via "Payment Settings" for his account on BetterHelp's website.

46.     Moreover, the BetterHelp acknowledgement email fails to describe a "cost-effective, timely, and easy-to-use mechanism for cancellation." BUS. & PROF. CODE § 17602(c).

**C.     BetterHelp's Cancellation Process Violates the ARL**

47.     BetterHelp's cancellation process is neither timely nor easy-to-use. BUS. & PROF. CODE § 17602(c).  Furthermore, it requires consumers to engage in further steps that obstruct and/or delay the consumer's ability to terminate the automatic renewal immediately. BUS. & PROF. CODE § 17602(d)(1).  BetterHelp also does not offer either of the cancellation methods required by the ARL for offers of automatic renewal services made online; cancellation is not provided by either a "prominently located direct link or button" in customers' account profile, or an "immediately accessible termination email formatted and provided by [BetterHelp] that a consumer can send to [BetterHelp] without additional information." BUS. & PROF. CODE § 17602(d)(1)(A)–(B).  Nor does BetterHelp offer a toll-free telephone number or email address consumers can contact to cancel. BUS. & PROF. CODE § 17602(c).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

48.     Instead, canceling a BetterHelp subscription requires consumers to log into their customer account and navigate to the "Payment Settings" page in order to cancel their account.  After this, BetterHelp puts in a series of steps customers must complete before canceling their account, which violates the ARL.

49.     Once consumers access their account page, there is no "prominently located direct link or button" to cancel.  Instead, consumers must figure out that they need to click on a dropdown menu to access their account settings.  Upon information and belief, BetterHelp's account settings page Plaintiff used in June 2023 was materially similar to BetterHelp's current payment page as reproduced on the following pages:

**CLASS ACTION COMPLAINT**                                                            19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Account settings

### Login information

davidbakerhorn@gmail.com

Update email address ▾

Update password ▾



#### About me

I am licensed in California with 11 years of professional work experience. I have experience in helping clients with stress and anxiety management, motivation, self esteem issues, & depression. I also have experience working with attachment issues, post-traumatic stress disorder, and relationship issues. I want to hear about your life and to help you find ways to navigate your days in ways that Read more...

#### Specialties

- Stress and Anxiety
- Motivation, self esteem, and confidence
- Depression
- Coping with life changes

#### Also experienced in:

Coping with addictions, LGBTQ+ related issues, Relationship issues, Family conflicts, Trauma and abuse, Coping with grief and loss, Intimacy related issues, Sleeping disorders, Parenting issues, Anger management, Career difficulties, Compassion fatigue, Concentration, memory and focus (ADHD)

**Also experienced in:**
Coping with addictions, LGBTQ+ related issues, Relationship issues, Family conflicts, Trauma and abuse, Coping with grief and loss, Intimacy related issues, Sleeping disorders, Parenting issues, Anger management, Career difficulties, Compassion fatigue, Concentration, memory and focus (ADHD)

**Years of experience:** 11

**Services offered**

MESSAGING    LIVE CHAT    PHONE    VIDEO

Change therapist

## Notifications

**Messages from therapist**
Notifications when you receive a new message from your therapist

☑ Email

☐ Text message

**Live session reminders**
Notifications when you have upcoming live sessions and support group sessions

☑ Email

☐ Text message

Push notifications can be updated in the app

**Save notification settings**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



50.     Similar to BetterHelp's payment page, customers must scroll through a series of menus to reach the "Payment Settings" option, which is hidden near the bottom of the page.  The text for the cancellation option is not larger than the surrounding text in light green, does not draw the eye, and is designed to be overlooked.

51.     For those customers who find the hidden cancellation link, they are brought to a popup screen:

## Change your membership 

○ **$80/week billed weekly** - a weekly live session and text, audio, and video messaging anytime for $80

⦿ **$65/week billed every 4 weeks** Most Popular! - a weekly live session and text, audio, and video messaging anytime for ~~$320~~ just $260

○ **Cancel membership**

Promo discount "yks" of 10% will be applied to the above prices until October 28, 2023.



Apply for financial aid

52.     "Cancel membership" is not the default choice and is overshadowed by the red text reading "Most Popular!" in the option to continue paying for a BetterHelp subscription.

53.     For the consumers who choose "Cancel membership" and then click "Save," the cancellation process is still incomplete.  Consumers are instead taken to yet another page, a survey page that is unclear on whether the subscription has been canceled:

Before you cancel your membership...

Have you discussed ending therapy with Louise Zervas Houchin?

○ Yes
○ No

If you don't mind sharing, why are you ending therapy?

○ My schedule does not match with the therapist's
○ I have achieved my therapy goals
○ I don't feel that I'm getting much benefit
○ The therapist advised me to do so
○ I can't afford it
○ The therapist does not have enough live session availability
○ The therapist isn't a good fit for me
○ The therapist isn't responsive
○ My therapist does not work with clients from my state
○ My therapist does not offer live sessions or the type of live sessions I want
○ Other

How likely is it that you would recommend Louise Zervas Houchin?

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |

Not at                                                                 Extremely
all likely                                                             likely

Not applicable

54.     Consumers who choose "No" in response to the question of whether they have discussed therapy with their matched therapist are shown yet another popup screen:



We strongly recommend that you discuss this with your BetterHelp therapist. ▮▮▮▮ ▮▮▮▮ can help you plan a proper closure of your therapy you have been receiving and provide you with some guidance going forward.

Cancel membership     **Write to my therapist**

55.     This screen attempts to dissuade consumers from canceling and "strongly recommend[s]" consumers to instead talk to their therapist. It further has a prominent option in bright orange to "Write to my therapist"—clicking this option exits the cancellation process and does

not complete cancellation.  For those consumers who instead choose the less prominent "Cancel membership" option in light green, this still does not cancel the BetterHelp subscription.  Instead, unbeknownst to consumers, they must instead complete the survey to complete the cancellation.

56.    After rating their matched therapist on a scale of 1 to 10, consumers are then presented with yet another popup screen, requiring them to click through seven additional screens—six survey questions and a request for feedback.  One of those seven screens is reproduced below:



57.    At this point, consumers still have not actually canceled their membership.  Instead, consumers who realize their subscription has not been canceled must scroll down on the cancellation page and finally find the "Cancel membership" button hidden at the bottom of the page, after acknowledging BetterHelp's warning that any history of their sessions "may become unavailable after my membership ends":

58.     BetterHelp's use of the "roach motel" dark pattern for cancelation is not timely, cost-effective, and easy-to-use, and therefore violates the ARL.  BUS. & PROF. CODE § 17602(c).

**D.     BetterHelp's Numerous ARL Violations Injured Plaintiff**

59.     Plaintiff was injured by BetterHelp's ARL violations in its enrollment process because had Plaintiff known that he was enrolling in an automatically renewing subscription that cost hundreds of dollars per month, he would not have enrolled in a BetterHelp subscription.

60.     Plaintiff completed the BetterHelp enrollment process and chose to enroll in a month-long BetterHelp subscription, costing $320, discounted to $288.

61.     BetterHelp charged Plaintiff $288 in June 2023, $288 in July 2023, and $320 in August 2023, for a total of $896.

62.     In August 2023, Plaintiff realized BetterHelp was automatically charging him each month and contacted the BetterHelp customer service to request a refund, but BetterHelp refused to refund the charges.

63.     Plaintiff was further injured by BetterHelp's ARL violations in its email acknowledgement and cancellation process because had he known the truth of BetterHelp's misleading and intentionally difficult cancellation process, he would not have enrolled in a BetterHelp subscription.

64.     Plaintiff intends to purchase services in the future for himself from online health and wellness companies, including BetterHelp, as long as he can gain some confidence in BetterHelp's

representations about its services and automatic enrollment, renewal, and cancellation practices. Moreover, BetterHelp still has Plaintiff's payment information and could use it to process further unauthorized payments.

### E.    BetterHelp's Violations of the EFTA Injured Plaintiff

65.    Plaintiff maintained an "account," as defined by the EFTA, in the form of his deposit account.  Plaintiff used a debit card linked to his account which could be used to initiate electronic fund transfers.

66.    BetterHelp never obtained Plaintiff's written consent for electronic fund transfers.

67.    BetterHelp's enrollment page inadequately disclosed that BetterHelp would initiate regular electronic fund transfers from Plaintiff's bank account.

68.    Plaintiff never provided written consent for BetterHelp to initiate electronic fund transfers.

69.    BetterHelp never provided Plaintiff with a copy of a written authorization for electronic fund transfers.

70.    Without authorization and without providing Plaintiff with a copy of any authorization, BetterHelp initiated recurring electronic fund transfers from Plaintiff in the amount of $288 and $320 per month.

71.    These electronic fund transfers occurred via charges to Plaintiff's debit card.  Charges to Plaintiff's debit card initiated an electronic fund transfer from Plaintiff's deposit account to BetterHelp.

### CLASS ALLEGATIONS

72.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by BetterHelp.  BetterHelp has engaged in uniform and standardized conduct toward the Class and this case is about the responsibility of BetterHelp, at law and in equity, for its knowledge and conduct in deceiving its customers.  BetterHelp's conduct did not meaningfully differ among individual Class Members in its degree of care or candor, its actions or inactions, or in

its false and misleading statements or omissions.  The objective facts on these subjects are the same for all Class Members.

73.    Plaintiff sues on his own behalf and on behalf of a Class for monetary and equitable relief under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

74.    The Class is preliminarily defined as follows:
All California consumers who have been charged by BetterHelp for an auto-renewing subscription for BetterHelp in connection with a purchase from March 5, 2024 to the date of judgment.

75.    Excluded from the Class are: Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.  Also excluded are federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

76.    Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiff files his motion for class certification.

77.    Plaintiff does not know the exact size of the Class since such information is in the exclusive control of BetterHelp.  Plaintiff believes, however, that the Class encompasses thousands of consumers whose identities can be readily ascertained from BetterHelp's records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

78.    The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within their control.  Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

79.    Plaintiff is an adequate class representative.  Plaintiff's claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.  Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by Defendant.

Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

80.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

81.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

a.   whether BetterHelp's conduct violates the applicable California consumer protection statutes and EFTA;

b.   whether Class Members have been injured by BetterHelp's conduct;

c.   whether, and to what extent, equitable relief should be imposed on BetterHelp to prevent it from continuing its unlawful practices; and

d.   the extent of class-wide injury and the measure of damages for those injuries.

82.     A class action is superior to all other available methods for resolving this controversy because (1) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for BetterHelp's conduct; (3) BetterHelp has acted or refused to act on grounds generally applicable to all Class Members; and (4) questions of law and fact common to the Class predominate over any questions affecting only individual Class Members.

83.     Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

    a.   whether BetterHelp's conduct violates the applicable California consumer protection statutes and EFTA;

    b.   whether Class Members have been injured by BetterHelp's conduct;

    c.   whether, and to what extent, equitable relief should be imposed on BetterHelp to prevent it from continuing its unlawful practices; and

    d.   the extent of class-wide injury and the measure of damages for those injuries.

84.    Accordingly, this action satisfies the requirements set forth under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rule of Civil Procedure.

## CAUSES OF ACTION

### COUNT 1

### CALIFORNIA AUTOMATIC RENEWAL LAW

85.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

86.    Plaintiff brings this claim on his own behalf and on behalf of the Class.

87.    The California Automatic Renewal Law, BUS. & PROF. CODE §§ 17600 et seq., became effective on December 1, 2010.

88.    BUS. & PROF. CODE §§ 17600 et seq. declares unlawful "the practice of ongoing charging of consumer credit or debit cards or third-party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." To effect its purpose, the law requires that certain clear and conspicuous disclosures be made to any California consumer being offered a product or service that will automatically renew at some point in the future. BetterHelp's conduct as alleged in this Complaint was unlawful because it failed to comply with the requirements of BUS. & PROF. CODE § 17602. BetterHelp's failures to comply include at least the following independent violations:

    a.   BetterHelp failed to present the terms of its automatic renewal or continuous service offer in a clear and conspicuous manner before fulfilling the subscription and in visual

proximity to the request for consent to the offer, as required by BUS. & PROF. CODE §
17602(a)(1);

b.      BetterHelp charged Plaintiff's and the Class's credit or debit cards for an automatic
renewal or continuous service without first obtaining the consumer's affirmative
consent to the agreement containing the automatic renewal offer terms or continuous
offer terms, as required by BUS. & PROF. CODE § 17602(a)(2);

c.      BetterHelp failed to provide an acknowledgment that includes its cancelation policy
and information regarding how to cancel as required by BUS. & PROF. CODE §
17602(a)(3);

d.      BetterHelp failed to provide a "cost-effective, timely, and easy-to-use mechanism for
cancellation," as required by BUS. & PROF. CODE § 17602(c);

e.      BetterHelp required consumers to engage in steps to cancel that obstruct or delay the
consumer's ability to terminate the automatic renewal or continuous service
immediately, in violation of BUS. & PROF. CODE § 17602(d); and

f.      BetterHelp failed to offer either of the cancellation methods required under BUS. &
PROF. CODE § 17602(d)(1)(A)–(B).

89.     Plaintiff and the Class are entitled to a declaration that BetterHelp's conduct was and
is unlawful in that its ongoing practices fail to comply with the requirements of the Automatic
Renewal Law.

## **COUNT 2**

### **CALIFORNIA UNFAIR COMPETITION LAW–UNLAWFUL BUSINESS PRACTICES**

90.     Plaintiff incorporates by reference all preceding and subsequent paragraphs.

91.     Plaintiff brings this claim on his own behalf and on behalf of the Class.

92.     BUS. & PROF. CODE § 17200 et seq. (the "Unfair Competition Law" or "UCL")
prohibits acts of "unfair competition," including any unlawful, fraudulent or unfair business acts or
practices as well as any acts contrary to the requirements of BUS. & PROF. CODE § 17500.

93.     Under the "unlawful" prong of the UCL, a violation of another law is treated as unfair
competition and is independently actionable.

94.     BetterHelp committed unlawful business practices under the UCL because it imposed
charges without complying with all applicable requirements of BUS. & PROF. CODE §§ 17600 et seq.,
as alleged above.

95.     As a result of BetterHelp's unlawful business practices, Plaintiff suffered an injury in fact and lost money or property.

96.     Pursuant to BUS. & PROF CODE §17203, Plaintiff and the Class are entitled to an order: (1) requiring BetterHelp to make restitution to Plaintiff and the Class; (2) enjoining BetterHelp from charging Plaintiff's and Class members' credit cards, debit cards, and/or third party payment accounts until such time as BetterHelp obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms and meets all other legal requirements; and (3) enjoining BetterHelp from making automatic renewal or continuous service offers in the State of California that do not comply with the California Automatic Renewal Law.

## COUNT 3

**CALIFORNIA UNFAIR COMPETITION LAW–UNFAIR BUSINESS PRACTICES**

97.     Plaintiff incorporates by reference all preceding and subsequent paragraphs.

98.     Plaintiff brings this claim on his own behalf and on behalf of the Class.

99.     BUS. & PROF. CODE §§ 17200 et seq. (the "Unfair Competition Law" or "UCL") prohibits acts of "unfair competition," including any unlawful, fraudulent or unfair business acts or practices as well as any acts contrary to the requirements of BUS. & PROF. CODE § 17500.

100.     The courts have adopted differing tests for determining whether a business act or practice is "unfair" under the UCL.  BetterHelp's practices as alleged above were and are "unfair" and therefore violative of the UCL, under any and all of these tests.  BetterHelp's practices have resulted in substantial injury to consumers that was not outweighed by any countervailing benefits to consumers or to competition and was not reasonably avoidable by the consumers themselves. Alternatively, BetterHelp's practices offended an established public policy and/or were immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.   Alternatively, BetterHelp's practices were contrary to a public policy "tethered" to a specific constitutional, statutory or regulatory provision.

101.    As a result of BetterHelp's unlawful, unfair, and fraudulent business practices, Plaintiff suffered an injury in fact and lost money or property.

102.    Pursuant to BUS. & PROF CODE §17203, Plaintiff and the Class are entitled to an order: (1) requiring BetterHelp to make restitution to Plaintiff and the Class; (2) enjoining BetterHelp from charging Plaintiff's and Class members' credit cards, debit cards, and/or third party payment accounts until such time as BetterHelp obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms and meets all other legal requirements; and (3) enjoining BetterHelp from making automatic renewal or continuous service offers in the State of California that do not comply with California Automatic Renewal Law.

## **COUNT 4**

### **CALIFORNIA UNFAIR COMPETITION LAW–FRAUDULENT PRACTICES AND FALSE ADVERTISING**

103.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

104.    Plaintiff brings this claim on his own behalf and on behalf of the Class.

105.    BUS. & PROF. CODE §§ 17200, et seq. (the "Unfair Competition Law" or "UCL") prohibits acts of "unfair competition," including any unlawful, fraudulent or unfair business acts or practices as well as any acts contrary to the requirements of BUS. & PROF. CODE § 17500.

106.    BetterHelp's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public, and thus constituted fraudulent business practices in violation of the UCL.  Moreover, those acts, omissions, nondisclosures, and misleading statements were contrary to the provisions of the False Advertising Law, BUS. & PROF. CODE § 17500 and constitute violations of the UCL for that reason as well.

107.    As a result of BetterHelp's unlawful and unfair business practices, Plaintiff suffered an injury in fact and lost money or property.

108.    Pursuant to BUS. & PROF. CODE §17203, Plaintiff and the Class are entitled to an order: (1) requiring BetterHelp to make restitution to Plaintiff and the Class; (2) enjoining BetterHelp

from charging Plaintiff's and Class members' credit cards, debit cards, and/or third party payment accounts until such time as BetterHelp obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms and meets all other legal requirements; and (3) enjoining BetterHelp from making automatic renewal or continuous service offers in the State of California that do not comply with California Automatic Renewal Law.

**COUNT 5**

**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**

109.   Plaintiff incorporates by reference all preceding and subsequent paragraphs.

110.   Plaintiff brings this claim on his own behalf and on behalf of the Class.

111.   The California Consumers Legal Remedies Act (the "CLRA"), CIV. CODE § 1770(a)(14), prohibits certain specified unlawful acts and practices if utilized in connection with any transaction involving the sale or lease of goods or services to a consumer.

112.   BetterHelp violated CIV. CODE § 1770, subdivisions (a)(5), (a)(9), (a)(14) and (a)(16) by, inter alia, representing that BetterHelp's goods and services have certain characteristics that they do not have; advertising goods and services with the intent not to sell them as advertised; representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; and representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

113.   Plaintiff and the Class members are "consumers" within the meaning of CIV. CODE § 1761(d) in that Plaintiff and members of the Class were charged by BetterHelp in connection with transactions involving goods or services sought or acquired for personal, family, or household purposes.

114.   BetterHelp's automatically renewing subscriptions constitute "goods or services" within the meaning of CIV. CODE § 1761.

115.   Plaintiff has standing to pursue these claims because he suffered injury in fact and a loss of money and/or property as a result of the wrongful conduct alleged herein.

116.   The charges imposed by BetterHelp, purportedly in exchange for automatically renewing subscriptions, on Plaintiff and Class Members are "transactions" within the meaning of CIV. CODE § 1761(e).

117.   As a direct and proximate result of result of BetterHelp's violations of the CLRA, Plaintiff and the Class were wrongfully charged fees for BetterHelp automatically renewing subscriptions.

118.   BetterHelp's conduct alleged herein was undertaken knowingly, willfully, and with oppression, fraud, and/or malice, within the meaning of CAL. CIV. CODE § 3294(c).

119.   On February 21, 2024, Plaintiff through counsel, sent a notice and demand letter by certified mail to BetterHelp, Inc. pursuant to CAL. CIV. CODE § 1782.  The letter advised Defendant that it was in violation of the CLRA and demanded it cease such violations and make full restitution by refunding unlawfully retained monies acquired by its CLRA violations upon customers' request.

120.   Accordingly, Plaintiff and members of the Class seek an injunction prohibiting BetterHelp from engaging in the unlawful practices alleged herein.  If BetterHelp fails to rectify or agree to rectify the unlawful acts detailed above and fails to give notice to all affected consumers within 30 days of written notice pursuant to § 1782 of the CLRA, Plaintiff will amend this Complaint to add claims for compensatory damages and restitution of any ill-gotten gains due to BetterHelp's acts and practices, as well as any other remedies the Court may deem appropriate.

## COUNT 6

### ELECTRONIC FUNDS TRANSFER ACT

121.   Plaintiff incorporates by reference all preceding and subsequent paragraphs.

122.   Plaintiff brings this claim on his own behalf and on behalf of the Class.

123.   The Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.*, was enacted "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants

in electronic fund and remittance transfer systems" and the "primary objective of this subchapter, however, is the provision of individual consumer rights." *Id.* § 1693(b).

124. Plaintiff and members of the Class are "consumers" and maintained an "account," as defined by the EFTA. 15 U.S.C. § 1693a(2), (6).

125. Pursuant to the EFTA, an "electronic fund transfer" is "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone." *Id.* § 1693a(7). The implementing regulation to the EFTA, Regulation E, expressly defines "electronic fund transfer" to include "[t]ransfers resulting from debit card transactions, whether or not initiated through an electronic terminal." 12 C.F.R. § 205.3(b)(1)(v).

126. BetterHelp's transfer of money from Plaintiff and the Class via debit cards is an "electronic fund transfer" within the meaning of the EFTA and Regulation E.

127. Pursuant to the EFTA, a "preauthorized electronic transfer" is "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(9). Regulation E has a similar definition. The EFTA requires that "A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). Regulation E describes a similar requirement.

128. As alleged above, Plaintiff and members of the Class did not provide authorization to BetterHelp for electronic fund transfers.

129. BetterHelp initiated preauthorized electronic fund transfers and took money from the accounts of Plaintiff and members of the Class without obtaining their written authorizations.

130. Because no such written authorization existed, BetterHelp did not provide a copy of any authorization for preauthorized electronic fund transfers to Plaintiff or members of the Class.

131.     BetterHelp transferred funds from Plaintiff's bank account in regular intervals via his debit card.  Upon information and belief, BetterHelp similarly initiated regular transfers from the bank accounts of members of the Class.  Plaintiff and members of the Class did not provide written authorization and BetterHelp did not provide Plaintiff and members of the Class with any copies of written authorizations.

132.     The Official Staff Interpretation of Regulation E explains, "when a third-party payee," such as BetterHelp, "fails to obtain the authorization in writing or fails to give a copy to the consumer . . . it is the third-party payee that is in violation of the regulation." 12 C.F.R. Part 205, Supp. I, § 205.10(b), cmt. 2.

133.     As a direct and proximate result of BetterHelp's violations of the EFTA and Regulation E, Plaintiff and members of the Class have suffered damages in the amount of the unauthorized debits taken by BetterHelp.  15 U.S.C. § 1693m.

134.     Plaintiff and the members of the Class are entitled to recover statutory damages in the amount of "the lesser of $500,000 or 1 per centum of the net worth of the defendant." *Id.* § 1693m(a)(2)(B).

135.     Plaintiff and members of the Class are also entitled to recover costs and attorneys' fees. *Id.* § 1983m(a)(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)     Issue an order certifying the Class defined above, appointing Plaintiff as Class representative, and designating Shub & Johns LLC and Wittels McInturff Palikovic as Class Counsel;

(b)     Find that Defendant has committed the violations of law alleged herein;

(c)     Enter an appropriate order awarding restitution and monetary damages to the Class;

(d)     Enter an order granting appropriate injunctive relief on behalf of the Class;

(e)     Award pre-judgment interest, costs, reasonable attorneys' fees and expenses; and

---

(f)     Grant all such other relief as the Court deems appropriate.

Dated:  March 5, 2024

**SHUB & JOHNS LLC**

By:     /s/ Jonathan Shub
        Jonathan Shub (Bar No. 237708)
        jshub@shublawyers.com
        Four Tower Bridge
        200 Barr Harbor Drive, Suite 400
        West Conshohocken, PA 19428
        Telephone: (610) 477-8380


**WITTELS MCINTURFF PALIKOVIC**

By:     /s/ Ethan D. Roman
        Ethan D. Roman*
        edr@wittelslaw.com
        305 Broadway, 7th Floor
        New York, New York 10007
        Telephone: (914) 775-8862

*Counsel for Plaintiff and the Proposed Class*

*\* Motion for pro hac vice admission forthcoming*

## <u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>

1.  I, Jonathan Shub, declare as follows:

2.  I am counsel for Plaintiffs, and I am a partner at Shub & Johns LLC.  I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

3.  The complaint filed in this action is filed in the proper place for trial because many of the acts and transactions giving rise to this action occurred in this District, and because Plaintiff resides in this District.

4.  Plaintiff Sean Small de law Cruz is a resident of Union City, California.

5.  Defendant BetterHelp, Inc. is a Delaware corporation and, upon information and belief, has its headquarters located at 990 Villa Street, Mountain View, California 94041.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, executed on March 5, 2024, at Fort Lauderdale, Florida.

_____/s/ Jonathan Shub_____
Jonathan Shub
